Maxey vs. Mack.

---

## MAXEY vs. MACK.

1. JURISDICTION: *Of County Board of Supervisors to try contested election.*
   Under the provisions of a special act of the General Assembly, approved the 23rd of May, 1874, authorizing an election for the County seat of Clayton (now Clay) County to be held, and the result determined by the election boards provided for in the act calling the Constitutional Convention of that year, the Board of Supervisors for that County had no jurisdiction to entertain a contest as to the validity of such election.

2. CONTESTED ELECTION FOR COUNTY SEAT: *Where Courts to be held pending contest*:
   Where an election was held, and the result duly declared in favor of removal, in pursuance of the provisions of an act authorizing a vote to be taken as the removal of a County seat, and a bill in chancery was subsequently filed to enjoin the removal and purge the returns for fraud; Held, that during the pendency of the proceeding it was the duty of the Circuit Judge to hold his Courts at the new County seat, which would be enforced by mandamus from this Court.

MANDAMUS to the Hon. L. L. MACK.

*Rose,* for petitioner.

The Board of Supervisors had no power to contest the election, their proceedings were void, *Brooks* v. *Baxter,* 29 Ark., 173.

Court of Chancery has no jurisdiction, *Moore* v. *Haisington,* 31 Ill., 243; *State* v. *Judge, etc.*, 13 La. An., 89; *Bacon* v. *York Co.,* 26 Me., 491; *Hart* v. *Harvey,* 32 Barb., 55; *O'Docherty* v. *Archer,* 9 Texas, 295; *Walker* v. *Tarrant Co.,* 20 id., 16; *Bonner* v. *Lynch,* 25 La. An., 267.

*J. M. Moore,* for defendant.

Petitioner does not show sufficient interest to entitle him to the writ, 25 Me., 291; 4 Mich., 98; ibid, 187; 1 Ark., 187; Topping, 27 and 8 Marg. The County Court has jurisdiction and its order is binding, 5 Ark., 22; 21 id., 444; 22 id., 214 *et seq*; Gantt's Digest, 595; Acts, '74, p. 12, sec. 3.

The chancery proceedings a bar to this. Tapping 23 Marg.; ibid 17; High on Inj., sec. 800; 21 Miss., 387.

If this court takes jurisdiction it must look to the vote, and decide upon a canvass of that. 2nd Metc., (Ky.) 68; 11 Wis., 17 and 27; Gantt's Digest, sec. 4154; Topping, 182 Marg.

ENGLISH, CH. J. :

The petition for mandamus, in this case, states that the petitioner, Robert B. Maxey, is a citizen, tax payer and practicing lawyer of Clayton county.

That he is engaged in the prosecution of divers causes in the Circuit, and other courts of record, of said county.

That the county seat of said county was legally located at the Town of Corning in the early part of the spring of 1873, and the courts of record of the county were there held until sometime in the month of August, 1874.

That by act of the Legislature, approved 23rd of May, 1874, the electors of the county were permitted to vote on the proposition to remove the county site from Corning to Boydsville, at

an election, provided by another act to be held on the 30th of June, 1874, on the question of calling a Constitutional Convention, etc.

That at said election Corning received the highest number of votes, as duly certified and returned by the County Board of Election Supervisors to the State Board, and was declared to be and remain the county site as provided by law.

By an exhibit to the petition, it appears that the County Board certified to the State Board of Election Supervisors, that 675 votes were cast for Corning and 655 for Boydsville.

The petitioner further states that Corning is now the lawful county site of said county, and that the courts of record should be held at that place, but that the Hon. Littleberry L. Mack, Judge of the second Judicial Circuit, embracing said county, refuses to hold the Circuit Court at Corning, and holds it at Boydsville, to the great injury, complication and confusion of all legal proceedings of said county, etc.

Prayer for mandamus to compel said judge to hold the November term, 1875, and other terms of the Circuit Court for said county, at Corning.

To an alternative writ, ordered by the Chief Justice of this court, in vacation, 2d November, 1875, a response was made.

In the response of the Judge, he relies upon an order of the Board of Supervisors of the county declaring Boydsville to be the county seat, and directing the courts to be held there. Also an injunction awarded by the County Judge, on a bill filed in the Circuit Court, prohibiting the Clerk of the Circuit Court from removing the public records from Boydsville to Corning, etc.

The relator demurred to the response, on the grounds that neither the Board of Supervisors nor the Chancery Court had any jurisdiction in the matter.

*First*—Had the Board of Supervisors jurisdiction?

The act of May 23d, 1874, provides "that the proposition to remove the county site of Clayton county from Corning to Boydsville, etc., shall be submitted to a vote of the qualified electors on the 30th day of June, A. D. 1874, at the same time that the Constitutional Convention is voted upon, and delegates thereto, and the said election shall be governed by the law prescribing the method of holding said election, and subjected to the same penalties, as for violation, as provided in said law." Sec. 1.

Section 2 provides that the electors voting for Corning shall place Corning on the tickets, and those voting for Boydsville shall place Boydsville on their tickets, the returns to be cast up, and made in the same manner as prescribed in the law for the Constitutional Convention.

The Convention act of 18th of May, 1874, provided that an election should be held on the 30th of June of the same year, at the several election precincts of every county in the State, for delegates to a Constitutional Convention, etc. It provided for a State Board of Election Supervisors, and a Board of Election Supervisors for each county. No person was permitted to vote elsewhere than in the precinct where he resided. The precinct judges were to make returns to the County Boards, and they to the State Board of Election Supervisors. Frauds in voting, or making returns, were made punishable by imprisonment in the Penitentiary. The Convention was to determine the election qualifications and return of its members.

The act of 23d of May, 1874, relating to the county site of Clayton county, further provides: "That if a majority of the votes should be cast in favor of Boydsville, then the county site shall be removed to Boydsville within *twenty days after the passage of this act*, and remain there as provided by law. It shall be the duty of the Clerk, immediately after the expiration of twenty

days, to remove all the records from Corning to Boydsville," etc., etc. Sec. 3.

The act makes no provision for the Board of Supervisors (then acting in the place of the former County Court) to entertain any contest about the election, or make any order about the removal of the county site. If the election resulted in favor of Boydsville, the county site was to be removed there within twenty days, and it was made the duty of the Clerk, immediately after the expiration of the twenty days, to remove the public records from Corning to Boydsville, etc. The meaning of the act manifestly is, that the removal of the county site was to occur within twenty days after the result of the election was ascertained and declared by the returning officers. The removal could not possibly be made within twenty days after the *passage of the act*, for the election was not to occur until about thirty-seven days after its passage.

From a transcript of the record of the Board of Supervisors' Court of Clayton county, made an exhibit to the response, it appears that on the 10th of August, 1874, some sort of a suit was pending in said court, wherein *Samuel Blackshear, et al.*, were plaintiffs, and *George H. Stephens, et al.*, were defendants. It appears to have been a special term of the court, called by the President of the Board.

In the first entry, after the caption, the Constable, on motion of the attorney of defendants, was granted leave to amend the return on the notice served on the defendants according to the facts. On motion of the same attorney, the summons was quashed, and he also filed a motion to quash the notice.

On the next day (11th of August) on motion of the plaintiffs' attorney, the Clerk was permitted to amend the "*subpœna*," and thereupon the attorneys of the parties argued a motion to dismiss the cause for want of jurisdiction, which motion the court

overruled, and decided that the notice to defendants was good. Thereupon the defendants filed an answer, to which plaintiffs demurred, and the demurrer was sustained. Then the plaintiffs read the complaint in the cause, and proceeded to introduce evidence.

Neither the complaint nor answer appears in the transcript.

On the next day (August 12th) one of the election supervisors produced in court the poll books and ballots of the election held in Clayton county, on the 30th June, 1874, and the court proceeded to open, count and examine the ballots of Killgore township, etc., after which the court continued to hear evidence.

On the next day (August 13th) the court rendered the following judgment, in substance :

" After hearing the evidence and argument of counsel, the court finds, after a thorough inspection of the poll book of Killgore precinct, of the election held on the 30th June, 1874, for the removal of the county site of Clayton county from Corning to Boydsville, that the number of 336 illegal votes were cast and counted for Corning at said precinct, etc., by persons being fraudulently permitted to vote, etc.; who were not qualified electors, or entitled to vote, etc. And the court further finds that there were 217 votes of the Killgore precinct for Corning, instead of 550 votes, and three votes for Boydsville, after purging and striking from the books the said 336 illegal votes cast and counted for Corning. And the court further finds that Boydsville received a majority of 316 votes of all the legal votes cast and counted at the various voting precincts of Clayton county at said election, etc. It is, therefore, considered by the court that said 336 illegal votes cast, counted and certified for Corning at said election in Killgore township, be purged, struck off and not counted for Corning, and that Boydsville received a majority of 316 votes, of all the votes cast at said election at the several and

various voting precincts of said county. And it is further considered and ordered by the court that the county site of said county is Boydsville, pursuant to law, and that the clerk is ordered to immediately remove all the records of all the courts, and all records belonging to said county now at Corning to the county site of said county, and place the same in the house known as Horten & Nevman's storehouse, in Boydsville, and said house shall hereafter be the courthouse and clerk's office of said county, in which house all the courts of record of the county shall hereafter be held, as provided by law, and all orders of this court, fixing the court house and clerk's office of this county at Corning, are hereby annulled and revoked, and the next term of the Circuit Court, etc., shall be held at said court house in Boydsville, and that plaintffs recover costs," etc.

A motion for a new trial was overruled, bill of exceptions taken, and an appeal to the Circuit Court prayed and granted, but it does not appear to have been prosecuted.

Under the above judgment of the Supervisors' Court the public records were removed from Corning to Boydsville, and the courts held there.

By act of April 3d, 1873, the county courts were abolished, and the jurisdiction, powers and duties exercised by them under existing laws transferred to boards of supervisors, provided for by the act. Gantt's Digest, ch. 17, p. 233.

By the Constitution of 1836 the County Courts were given jurisdiction " in all matters relating to county taxes, disbursements of money for county purposes, and in every other case that may be necessary to the internal improvement and local concerns of the respective counties." Art. 6, sec. 9.

The same provision was repeated in the Constitution of 1864. Art. 7, sec. 11.

By the Constitution of 1868, it was provided that " the inferior courts of the State, as now constituted by law, except as

hereinafter provided, shall remain with the same jurisdiction as they now possess : *Provided*, that the General Assembly may provide for the establishment of such inferior courts, changes of jurisdiction, or abolition of existing inferior courts, as may be deemed requisite," etc. Art. 7, sec. 5.

By a general statute (Gannt's Digest, ch. 34), it is provided that whenever one-third of the qualified electors of any county shall petition the board of supervisors (County Court in the act as originally passed) for a removal of the seat of justice of such county to any other designated place, the board shall order an election, directing that the proposition to remove such seat of justice to the place named in the petition be submitted to the qualified electors of the county, and shall order that public notice be given of such proposed removal, etc., etc. If it shall appear by such election that a majority of the qualified voters voting at such election, etc., are in favor of the removal of the county site of such county, then the board of supervisors shall appoint three commissioners to select a site whereon to locate the public buildings. Provisions follow to the effect that the commissioners, after qualifying, shall select the most suitable place designated in the petition, whereon to locate the public buildings, and may purchase not less than one nor more than fifty acres of land, and may receive, as a donation, such parcel of land, or town lots, including the place selected as a seat of justice for the county. That the vendor or donor shall execute a deed to the county, etc., and the commissioners shall make a report, etc., accompanied by the deed, etc., to the Circuit Court, at the next term thereof, and if approved by the judge, he shall so certify to the board of supervisors, then the place so selected shall be the permanent seat of justice of the county, etc., etc. Then the board of supervisors shall, within a reasonable time, not exceeding eighteen months from the date of the election, etc., provide

the necessary means for and proceed to the erection of all neces-
sary county buildings, and as soon as such buildings are com-
pleted at such new seat of justice, the board of supervisors shall
notify the judges of the several courts holden in the county, at
the next term thereof, who shall cause the sheriff to make procla-
mation at the court house, in term time, that such court will
thereafter be held at the place so selected.

Possibly, where an election was held under this general law,
ordered and conducted under the direction and supervision of
the supervisors' court, the court had the implied power to inquire
into the regularity and fairness of the election, and to see that a
majority of the qualified electors voting at the election had voted
for the removal of the county site to the place designated in the
petition for the election, before appointing commissioners to se-
lect and purchase a site for the public buildings.

But the election in question for the removal of the county site
of Clayton county was not ordered by the board of supervisors,
nor conducted under their supervision, nor were the returns
made to them, nor were they authorized to canvass the returns
and declare the result.

The Legislature thought proper to authorize the qualified vo-
ters of the county, by special act, to vote upon the proposition
to remove the county site from Corning to Boydsville at the elec-
tion for delegates to the Constitutional Convention, and the re-
turns were to be made to, canvassed, and the result ascertained
and declared by the election boards, and in the manner provided
for in the act authorizing the election for delegates, etc.

It was provided by the special act, as we have above stated,
that if the majority of the votes should be cast in favor of Boyds-
ville, the county site was to be removed to that place within
twenty days, and the clerk, immediately after the expiration of
that time, was to remove all the records from Corning to Boyds-
ville, and all writs were to be returned there, and persons held

to bail were to appear there, and all sales to be made under decrees and executions were to be made there.

There was to be no delay for commissioners to select and purchase a site for public buildings, and for buildings to be erected, etc., as under the general act for the removal of county sites. It was evidently contemplated by the special act, that the courts, as well as the clerk and the public records, would go at once to the new county site.

But the result of the election, as ascertained and declared by the election boards entrusted with that duty, was in favor of Corning, and not Boydsville.

On the face of the returns, Corning was elected and Boydsville defeated; by what authority then, did the board of supervisors, entrusted by the special act with no duty relating to the election, undertake to go behind the returns, inquire into the qualifications of persons who voted, purge out votes cast for Corning, declare Boydsville elected, and order the clerk to remove the public records there, and direct that the Circuit Court should be held there ?

The counsel for the respondent submits, that the board of supervisors had general jurisdiction in all cases necessary to the internal improvement and " local concerns of the county," and that the election in question was a local concern, and within the general grant of jurisdiction.

The existence and general jurisdiction of the county courts were provided for by the constitutions of 1836 and 1864, but under the constitution of 1868, they were subject to the legislative will; hence, as we have seen, the legislature abolished the county courts, and substituted boards of supervisors, transferring to them, the jurisdiction previously exercised by the county courts, subject to legislative control.

In the special act in question, the legislature thought proper to pass by the board of supervisors, and entrust the management of the election to the election boards provided for in the convention act. The legislature might have gone further, had it thought proper, and authorized other agents than the board of supervisors, to provide temporary, finally permanent, public buildings, at Boydsville, in the event that the election resulted in favor of that town for the county site, but this was not done, and the board of supervisors were left to exercise such jurisdiction in relation to the public buildings, under the general law, as was consistent with the special act.

Our conclusion is, that the judgment of the board of supervisors in question, was void for want of jurisdiction of the subject matter, and furnished no legal excuse for the refusal of the respondent to hold the Circuit Court at Corning.

*Second*—As to the jurisdiction of Chancery.

Another transcript made an exhibit to the response of his honor, the circuit judge, shows that on the 14th of July, 1875, and after the present constitution went into force, a bill was filed on the chancery side of the Circuit Court of Clayton county, wherein Samuel Blackshare and others were plaintiffs, and William H. South, as clerk of said Circuit Court, and sixteen other persons named, were defendants, alleging in substance as follows:

The plaintiffs, for themselves and others, allege that they are citizens and tax-payers of Clayton county, owners of valuable lots and lands in Boydsville, and interested in suits pending in the said Circuit Court, etc.

That an election was held on the 30th June, 1874, at the several precincts of the county, under the convention act of 18th May, and the special county site act of 23d May, 1874, setting out the purposes of the election, etc.

That defendants named fraudulently combining and confed-erating together for the purpose of preventing the County site from being removed from Corning to Boydsville, falsely, wilfully and fraudulently did procure the following named persons, to-wit: [*Here follows names covering over six foolscap pages.*] to illegally cast their votes, at Killgore precinct, for Corning, etc. That said persons were not residents of Killgore precinct, and not otherwise qualified electors, etc., etc., which defendants well knew at the time they procured them to vote, etc.

That defendants, on the day of election, forged and placed on the poll books of Killgore precinct, after the polls were closed, the names of seventy-three persons, not present at the election, and also forged a like number of ballots for Corning, numbered to correspond with the forged names, which were counted and cer-tified for Corning by the Judges and Clerks of said election precinct, etc.

That defendants, in order to defeat Boydsville, fraudulently procured the three persons (naming them) who had been ap-pointed, by the County Board of Election Supervisors, to act as Judges of the election at the Killgore precinct, not to be present at the opening of the polls at the time required by law, and fraudulently procured three other persons (naming them) to be appointed Judges, and three others (named) Clerks, so that the frauds and forgeries above mentioned might be committed.

That defendant frudulently procured 353 illegal votes to be cast for Corning, at Killgore precinct, and by threats and intim-idation compelled the County Supervisors of the election (who are named) to receive the poll books of Killgore, on which said illegal votes were counted for Corning, etc.

That at the time of the election there were not more than 200 legal voters residing in Killgore precinct, but that defendants fraudulently caused to be falsely certified that 553 legal votes

were cast for Corning, etc., having procured 353 illegal votes to be voted for Corning, etc.

That to carry out their fraudulent purpose, defendants gave a barbacue on the day of the election, and procured the Cairo & Fulton Railroad Company to run a special train from Newport, Jackson county, and bring to the polls a lot of railroad "plug-uglies," etc., etc., who were along the line of the road from Corning to Newport, and after feeding, and giving them whisky, marched them to the Killgore polls and voted them for Corning.

That defendants also procured said company to run a special train from Bismarck, Missouri, to bring illegal votes for Corning, etc.

That of all the legal votes cast in the county, Boydsville received a majority of 350 votes over Corning, etc., and was duly elected as the county site, etc. That defendants caused to be perpetrated the grossest frauds at said election in order to defeat Boydsville, etc.

That William H. Smith, the Clerk of the Circuit Court, etc., one of the defendants, combining and confederating with the other defendants, was threatening to illegally remove the records of the county from Boydsville, the county seat, to Corning, a railroad station, etc.

Prayer that the Clerk be enjoined from removing the records from Boydsville to Corning, that the Killgore poll books be purged of the 353 illegal votes cast and counted for Corning; the illegal and fraudulent certificates of said election annulled, and that Boydsville be declared the county site, etc.

The Circuit Judge being absent from the county, a temporary injunction was granted by the Judge of the County Court under section 37, article 7 of the present constitution. It does not appear from the transcript before us that any further steps have been taken in the case.

The allegations of the bill, if true, make a case of gross fraud in the election at the Killgore precinct.

Mr. Cooley says: "As the election officers perform for the most part ministerial functions only, their returns, and the certificates of election, which are issued upon them, are not conclusive in favor of the officers who would thereby appear to be chosen, but the final decision must rest with the courts. This is the general rule, and the exceptions are of those cases where the law, under which the canvass is made, declares the decision conclusive, or where a special statutory board is established with powers of final decision. And it matters not how high and important the office, an election to it is only made by the candidate receiving the requisite plurality of the legal votes cast, and if any one, without having received such plurality, intrudes into an office, whether with or without a certificate, the courts have jurisdiction to oust, as well as to punish him for such intrusion. When, however, the question arises collaterally, and not in a direct proceeding to try the title to the office, the correctness of the decision of the canvassers cannot be called in question, but must be conclusively presumed to be correct," etc. Const. L., 623-4.

These remarks of the learned commentator relate directly to elections for public officers, and it may be said, in general terms, that so careful are our laws that the will of the qualified electors shall be fairly expressed, and carried out by the election officers, that provision has been made to contest, either before the Legislature, or the courts of law, in some mode, the election of all state and county officers, from the highest to the lowest.

But this was not an election of a public officer. It was an election authorized by a special act on a proposition to remove a county site, and cannot be contested in the ordinary modes, on *quo warranto*, or suit for usurpation of office, nor does the special

act authorizing the election provide any mode of contest, or expressly make the certificate of the election supervisors final and absolute.

It may be laid down as a general rule, subject to few exceptions, that courts of equity exercise a general jurisdiction in cases of fraud, sometimes concurrent with, and sometimes exclusive of other courts.  1 Story Eq. Jur., sec. 184, etc.

Whether the case in question falls within the general rule, or the exceptions, is not free from all doubt. There are decisions in cases somewhat similar, which are not in harmony.  *Walker* v. *Tarrant County*, 20 Texas, 16 ; *Sanders* v. *Metcalf*, 1 Cooper Tenn. Ch. R., 424; *Rice* v. *Smith, County Judge*, 9 Iowa, 570; *People ex rel.* v. *Mitchell & Warfield*, 20 Illinois, 163 ; *Sweat* v. *Faville,* 23 Iowa, 326 ; *Board of Supervisors* v. *Keady et al.*, 34 Ill., 293 ; *Edwards et al.* v. *Hall et al.* (Prairie county seat case), *ante.*

But suppose it be conceded, for the purpose of disposing of the only matter before us in this case, that the Circuit Court, sitting in chancery, has jurisdiction of the case as made by the bill, where is the court to sit until the matter is adjudicated? At Boydsville ?   Surely not.   At the time the special act authorizing the election was passed, Corning was the established county seat, the certificate of the County Board of Election Supervisors, that a majority of the votes was in favor of Corning, must be taken as true until overturned in some legal mode, and the order of the Board of Supervisors, declaring Boydsville to be the county site, being void for want of jurisdiction of the subject matter, and furnishing no valid authority for respondent to hold the Circuit Court there, he must necessarily hold it at Corning until the case made by the bill in chancery is finally adjudicated.

But it is objected by counsel that if respondent be compelled by mandamus to hold the court at Corning, the Clerk is nevertheless enjoined, by a fiat of the County Judge, from removing

the records from Boydsville to Corning. Very well, but we have seen that the Clerk had no valid legal warrant for removing the records from Corning to Boydsville, and that, under the present aspect of the matter, Corning is the proper place for the records. And the Circuit Judge has the power, in vacation or term time, to set aside the temporary injunction awarded by the County Judge, and save the Clerk of his own court harmless in the premises. Art. 7, sec. 37, Const., sec. 2, act March 5, 1875.

The demurrer to the response must be sustained, and a peremptory mandamus awarded.