## GRAHAM *v.* NIX.

### Opinion delivered February 12, 1912.

1. COUNTIES—CHANGE OF COUNTY SEAT.—Const. 1874, art. 13, section 3, providing that no county seat shall be changed without the consent of a majority of the qualified voters of the county, refers to a removal of a county seat from one town to another and not to a removal from one site to another in the same town.   (Page 280.)

2. SAME—CHANGE OF COUNTY SEAT.—Kirby's Digest, section 1115, making it unlawful to change any county seat without the consent of a majority of the qualified voters of the county, refers to a removal of a county seat from one town to another, and not from one lot to another in the same town.   (Page 283.)

3. SAME—CHANGE OF LOCATION OF COUNTY SEAT.—Under its general jurisdiction over the internal improvement and local concerns of its county, the county court has authority to provide for the removal of a county seat from one lot in a town to another lot in the same town. (Page 286.)

4. SAME—JURISDICTION OF COUNTY COURT.—As the power of the county court over the location of public buildings is a continuing one, the county court, after ordering a courthouse to be built on a certain lot, may at a subsequent term order the courthouse to be built on another lot in the same town.   (Page 286.)

5. SAME—ABUSE OF DISCRETION IN LOCATING COURTHOUSE.—For an abuse of the discretion of the county court in selecting the wrong site for courthouse, the remedy is by appeal.   (Page 287.)

Appeal from Dallas Chancery Court; *J. M. Barker,* Chancellor; reversed.

*Morton & Morton, P. G. Matlock, Gaughan & Sifford,* and *Rose, Hemingway, Cantrell & Loughborough,* for appellants.

1.  The Constitution on the removal of courthouses, county seats, seats of justice, etc., only applies to and contemplates a removal from one town to another.   Removals of courthouses from one lot to another in the same town are within the jurisdiction of county courts.   Const. Ark. art. 7, § 28; 26 Ark. 37; 50 *Id.* 447; 34 So. 171; Kirby's Digest, § § 1014, 1015; 63 Ark. 397; 68 *Id.* 340; 73 *Id.* 523; 93 *Id.* 1; 67 Miss. 1; 118 Ind. 51; 20 N. E. 642; Const. art. 13, § 3; 51 Ark. 540.

2.  LEGISLATIVE USE.   All the acts passed refer to removals from one town to another.   Gould's Digest, ch. 44, § § 7, 12, 20, etc.; Acts 1869, p. 74; *Ib.* p. 34.   JUDICIAL USE.   See 5 Ark. 21; 21 *Id.* 441; 27 *Id.* 215; 28 *Id.* 207; 60 Ark. 158; 30 Ark.

474, 481; 33 *Id.* 192; 49 *Id.* 227, 54 *Id.* 414; 55 *Id.* 326.   A town is always the "county seat," and the Legislature never meant to restrict the meaning to a lot of ground.   Cases *supra*; Kirby's Digest, § § 1115 to 1123; 53 Ark. 553; 54 Ark. 645; 73 N. Y. Supp. 1098; 74 *Id.* 1142.

*Miles & Wade* and *Dan W. Jones,* for appellees.

1.   The decree shows that the cause was heard upon oral testimony not included in the transcript.   94 Ark. 117; 45 *Id.* 240; 93 *Id.* 394; 85 *Id.* 101.

2.   The school district land in Fordyce is the county seat.   Kirby's Digest, § § 1115, 1117, 1121, 1129; Const. Ark. art. 13, § 3; 132 S. W. 214; 27 Ark. 202.   It was so determined by ballot and the place and location of the courthouse fixed. Kirby's Digest, § 1115; 132 S. W. 214.   The courts require strict compliance with the law.   11 Cyc. 371; 15 L. R. A. 501; 61 Ark. 477; 73 *Id.* 270.

3.   The county seat has never been removed from the school land.   A special act does not repeal the general law. 28 Ark. 502; 3 Bibb (Ky.) 180; 14 La. Ann. 667; 121 Ala. 363; 67 Conn. 261; 5 Bush. (Ky.) 301; 105 Mich. 70; 33 N. J. L. 363; 41 C. C. A. 667; 32 *Id.* 585-6.   Further, the county court has exclusive jurisdiction.   33 Ark. 191; 73 Ark. 523.

4.   The county court has finally settled the matter, and no other jurisdiction has power to modify or change its final judgment.   96 Ark. 427.

McCULLOCH, C. J.   The county seat of Dallas County was, by vote of the people at an election duly held on August 29, 1908, removed from Princeton to Fordyce, and an order of removal was duly entered by the county court, after canvassing the returns, pursuant to the result of said election.   Before the election for removal of the county seat was ordered, an abstract of title to a tract or lot in the town of Fordyce proposed to be donated as a site for the new courthouse was filed and presented with the petition of the citizens who asked for the removal.   The proposed tract or lot was properly and accurately described, but, for the purpose of stating the case it will be referred to as the school district lot.   Certain citizens of the county who objected to the removal from Princeton undertook

to contest the proceedings after the county court had, on October 6, 1908, entered its judgment declaring the result of the election and ordering the removal of the county seat pursuant thereto. On appeal to the circuit court it was decided that the removal proceedings were valid, and on appeal to this court that decision was affirmed. *Walsh* v. *Hampton,* 96 Ark. 427.

The county court in its order of October 6, 1908, appointed commissioners for the purpose of erecting a courthouse, and directed them to proceed to erect a suitable building on the tract or lot designated as aforesaid. This order of the county court was renewed on January 4, 1911, and the commissioners were then ordered to prepare for building the courthouse on the said lot. Subsequently the commissioners reported plans for the building, which plans were approved by the county court, and they were ordered to advertise for bids for the construction of the building. On May 31, 1911, the commissioners made report to the county court that they had let the contract to the lowest bidder, and this was approved by the court. They also reported at that time that they found that the original site donated (the school district lot) was not a suitable place on which to erect the courthouse, and that G. M. Hampton had proposed to donate and convey to the county certain other lots in the town of Fordyce for a courthouse site, and also that A. B. Banks had proposed to donate and convey to the county certain other lots in said town for a courthouse site. The county court thereupon made an order directing that if either of said parties should within ten days convey said lots as proposed the commissioners should accept one of said donations and proceed to erect the courthouse on the lot so donated, conveyed and accepted. On July 3 the commissioners reported that, "pursuant to the order of the court made on May 31, 1911, and the power vested in them by law," they had selected the Banks lots as the proper site upon which to erect the courthouse, and that said donor had executed a deed conveying said lots to the county in fee simple and that they had accepted the same as the site for the courthouse. The county court made an order approving and confirming said action of the commissioners in selecting said lots as the site for the courthouse and in accepting the donation. In the meantime the General Assembly of 1911 enacted a special

statute, which was approved by the Governor April 19, 1911, whereby said commissioners, appointed by the county court of Dallas County, were "authorized and impowered to receive by donation a lot, parcel or piece of ground within the corporate limits of the said city of Fordyce, for the purpose of building a courthouse thereon, and the same, when donated and deeded to the county for said purposes and accepted by said commissioners, shall be the site for the location of the courthouse of Dallas County."

Appellees, as citizens and taxpayers of the county, thereafter instituted this action in the chancery court of Dallas County to restrain the courthouse commissioners from proceeding to erect the new courthouse on the site last selected. The chancery court, on final hearing of the cause, decided that the school district lot had been established as the permanent county seat of Dallas County, and that the action of the commissioners and the order of the county court in selecting another site for the courthouse was void. The prayer of the complaint was granted, restraining the commissioners from erecting the courthouse on the Banks lot, and the commissioners appealed.

The conclusion of the learned chancellor was manifestly based on the view of the law that the removal of the county seat from Princeton by vote of the people was to the particular tract or lot of land in Fordyce proposed as the site for the courthouse, and that the county court had no power to change that designation and remove the courthouse to another site in Fordyce except upon another vote of the people as prescribed in the Constitution and statutes regulating the removal of county seats. Counsel for appellees base their defense of the decree on that view of the law.

This brings up for consideration the question as to what is meant in our laws concerning the removal of county seats by the provision for vote of the people. Does it mean that a vote is required on the question of changing the courthouse site from one lot to another in the same town or only on the removal of a county seat from one town to another? Is the county seat confined to the tract or lot of ground on which the courthouse is located, or is it the town designated as the county seat or seat of justice? The latter question seems to have been an-

swered by this court in an opinion written by Judge BATTLE giving a definition of the term "county seat."

"In every county of this State there is, and must be, a county seat. At it the county court is required to erect a good and sufficient courthouse and jail. The county, circuit and other courts held for the county must sit there. There is no other place designated by law for that purpose. The name 'county seat,' indicates the object of its creation. It is, as defined by the Century Dictionary, 'the seat of government of a county; the town in which the county and other courts are held, and where the county officers perform their functions.' *Williams* v. *Reutzel*, 60 Ark. 155. Other cases seem to give the same meaning to the term by referring to the town in every instance as the county seat. Ex parte *Blackburn*, 5 Ark. 21; *Rogers* v. *Sebastian County*, 21 Ark. 440; *Patterson* v. *Temple*, 27 Ark. 202; *McNair* v. *Williams*, 28 Ark. 200; *Maxey* v. *Mack*, 30 Ark. 472; *Russell* v. *Jacoway*, 33 Ark. 191; *Neal* v. *Shinn*, 49 Ark. 227; *Rucks* v. *Renfrow*, 54 Ark. 409; *Hudspeth* v. *State*, 55 Ark. 323.

The earliest legislation recorded on our statute books concerning removal of county seats is found in the Revised Statutes of 1838, which provided that whenever a majority of the taxable inhabitants of any county should petition the county court praying for removal of the "seat of justice," the court should order an election for the purpose of electing three commissioners "to locate the seat of justice." The statute further provided that the commissioners, after election and qualification, should "select a suitable site for the location of the seat of justice;" that they should be impowered "to receive donations in lands or money and building material for the purpose of building such public buildings as may be necessary for the use of the county at the place selected by them as the seat of justice;" and that they should have power "to make entry of land and  *  *  *  to subdivide and lay off into lots all such lands as they may acquire by entry, donation, or otherwise, and to dispose of the same at public auction." It further provided that the seat of justice established for a term of four years should not be changed "unless the county court shall cause a sufficient tax to be assessed on all taxable property within the county *to pay the owners of lands at such seat of justice*

*for their lands and improvements,"* and in that event "the county court shall appoint three disinterested persons, not residents of the county, to value all lots and improvements in such seat of justice." Rev. St. c. 39.

It needs no comment or argument to show that the framers of that statute referred to the town as the seat of justice, and not merely to the courthouse site.

The statute above referred to remained in force until March 16, 1869, when it was superseded by another statute on the subject. The new act provided that whenever one-third of the electors of any county should petition the county court for the removal of the seat of justice to any other designated place the court should order an election, directing that the proposition to remove such seat of justice to the place named in the petition be submitted to the qualified electors of the county. It then provided that if the vote was in favor of removal the county court should appoint three commissioners "to select a site whereon to locate the county buildings," and that the commissioners should be impowered to purchase "not less than one nor more than fifty acres of land, and may receive as a donation such parcel of land or town lots including the place selected as the seat of justice."

It is manifest that the language of this statute, so far as concerns the removal of the county seat, refers to the removal to a town. This is evident from the provision for appointing commissioners to select the site after the election at which the removal is voted. It is plain, therefore, that up to this time the Legislature referred to the county seat or seat of justice as the town in which the courthouse was located. The law thus stood in that condition until the adoption of the Constitution of 1874, which was the first provision on that subject found in any Constitution of this State.

"No county seat shall be established or changed without the consent of a majority of the qualified voters of the county to be affected by such change, nor until the place at which it is proposed to establish or change such county seat shall be fully designated. Provided, that in the formation of new counties the county seat may be located temporarily by provisions of law." Art. XIII, § 3.

Now, it is fair to assume that the framers of the Con-

stitution used the term "county seat" in the sense that it was used in prior legislative enactments on the subject, and in the sense in which it had been used in decisions of this court. In *Vahlberg* v. *Keaton*, 51 Ark. 540, this court said:

"When the framers of a constitution employ terms which, in legislative and judicial interpretation, have received a definite meaning and application, which may be either more restricted or more general than when employed in other relations, it is a safe rule to give them that signification sanctioned by the legislative and judicial use."

This is also the meaning of the term when considered in its popular sense; and if we adopt that mode of interpretation, the same result is reached. We conclude, therefore, that the framers of the Constitution, in prescribing the conditions upon which a county seat may be removed, referred to removal from one town to another, and not from one courthouse site to another in the same town. This view of the constitutional provision obviates any inconsistency between that provision and later statutes on the subject of removal and another statute which has been brought forward from the Revised Statutes of 1838 authorizing the county court to "designate the place whereon to erect any county building on any lands belonging to the county at the established seat of justice thereof."

The next legislation on this subject was an act approved March 2, 1875, which remains in force to this day, and the first section of which reads as follows:

"Unless for the purpose of the temporarily location of county seats in the formation of new counties, it shall be unlawful to establish or change any county seat in this State without the consent of a majority of the qualified voters of the county to be affected by such change, nor until the place or places at which it is proposed to establish or change any county seat shall be fully designated, such designation embracing a complete and intelligible description of the proposed locations, together with an abstract of title thereto and the terms and conditions upon which the same can be purchased or donated by or to the county. Provided, the county court shall not order the election hereinafter provided for unless it shall be to satisfied that a good and valid title can and will be made to

the proposed new locations or one of them." Kirby's Digest, § 1115.

Other sections of that act read as follows:

"Before any of the orders of the county court contemplated by section 1121 shall be made, or, if made, before they shall be executed, the vendor or donor of the new location shall make or cause to be made and deliver to the county judge a good and sufficient deed, conveying to the county the land or location so sold or donated in fee simple, without reservation or condition, and also an abstract of the title papers, deeds and conveyances, and assurances by or through which the title thereof is derived, who shall file the same for record in the recorder's office of such county, to be recorded as other title deeds and papers. Then the place so deeded shall be the permanent county seat, and the title shall be vested in the county." Kirby's Digest, § 1122.

"When the deed to the new location shall have been executed and the title vested in the county, as provided in the preceding section, for the purpose and intention of this act, the county court is hereby authorized and impowered to appoint three discreet citizens as the county commissioners, who shall take an oath to faithfully demean themselves as such, and who, under the orders and directions of the county court in pursuance of the provisions of this act, shall superintend and contract for, in the name and behalf of the county, the clearing, grubbing and laying off such new location into suitable and convenient town lots and the erection or purchase of all needful buildings on such new location, preparatory to the actual removal and change of the county seat." Kirby's Digest, § 1123.

In the construction of this statute we should indulge the presumption that it was meant to conform to the constitutional provision on that subject and to only require an election by the people where it was required by the Constitution, leaving the county court with full power to act in matters not forbidden by the Constitution. It is true the language of this statute is peculiar and somewhat ambiguous in its provision for the designation of the new location, but we are of the opinion that this merely referred to a site for a courthouse in the event of a removal to the town designated. It was not intended as a requirement that there should be a vote of the people before a

county court could order a change in the location of the court-house from one lot to another in the same town. The Constitution invests the county court with exclusive original jurisdiction "in all matters relating to county taxes, roads, bridges, ferries, * * * the disbursement of money for county purposes,and in every other case that may be necessary to the internal improvement and local concerns of the respective counties." Art. 7, § 28. In view of this broad provision as to the jurisdiction of county courts, it is hardly conceivable that the framers of the Constitution meant, by the provision for removal of county seats, which, we hold, referred to removals from one town to another, to restrict the power of the county court in ordering the removal of the courthouse from one lot to another, which may under some circumstances become immediately a matter of the highest local concern. It would require very plain and unambiguous language to force the conclusion that a restriction in that respect was intended.

The case of *Matkin* v. *Marengo County*, 137 Ala. 155, 34 Southern 171, is cited by counsel for appellants in support of their contention, and we find it to be directly in point. The Constitution of Alabama contains the following provision:

"No courthouse or county site shall be removed except by a majority vote of the qualified electors of said county voting at an election held for such purpose."

The county commissioners attempted to remove the courthouse from its location to another lot in the same town, and citizens attempted to restrain the removal on the ground that it was forbidden by the Constitution except by vote of the people. The court, in denying the petition said:

"The construction contended for by counsel for appellants, that 'courthouse site' should be held to mean the particular lot upon which the building is erected, is too narrow and unsupported by sound reason, and, if adopted, would likely lead to greater public detriment, in possible cases, than mere inconvenience. Our conclusion is, and we so decide, that it was and is intended by section 41 that no courthouse shall be removed from the town or city where located at the time of the adoption of the Constitution, except as provided in said section, and not that a new courthouse may not be erected within such town or city on a lot other than that upon which the old is

located, whenever determined necessary by the court or county commissioners, without first having submitted such question to a vote of the people."

Our conclusion, therefore, is that the county court possessed the power to change the site of the courthouse from the school district lot in Fordyce to the proposed location donated by Banks.

It is unnecessary to pass upon the constitutionality of the special statute authorizing the board of commissioners to select a site, for, as the county court had power to make the selection and order a removal to that site, and did so in this instance, it is unnecessary to say whether it must be put upon the authority of the county court or of the special statute.

It is contended that the order of the court entered October 6, 1908, declaring the result of the election and ordering the removal of the county seat, and the subsequent orders of that court directing the commisssioners to proceed to the construction of the courthouse on the school district lot, could not be set aside at a later term, and that the order of the county court in May, 1911, changing that order was void. The power of the county court over the location of public buildings is a continuing one. It is the same as if the building had been constructed on the school district lot, and afterwards the county court saw fit to dispose of that site and change to a new location in the town which constituted the county seat. If the county court had the power at all to order a change of the location of the courthouse, it had the power to make this change before the building was actually constructed as well as to wait until its order was carried out by the construction of the new building and then to order the change. There is nothing in the decision in *Walsh* v. *Hampton, supra,* which limits the power of the county court to make a new order with respect to the change of location. In that case we merely held that the order of the court, declaring the result of the election and ordering the removal, was final, and could not be vacated at a subsequent term; but that was a matter over which the county court had no continuing power. After it declared the result of the election and ordered the removal pursuant thereto, its power was exhausted. The difference between the two kinds of judgments lies in the continuing power of the county

court over the subject of county buildings, as distinguished from the power to declare the result of an election by the people.

The record shows that the chancellor heard oral testimony, which is not included in the transcript, and it is insisted that for this reason the presumption must be indulged that the decree was correct, and that an affirmance must therefore follow. The decision of the chancellor was incorrect upon the undisputed facts, and can not be aided by any presumption as to the oral testimony. That testimony could only have related to the issue as to which was the more desirable of the proposed sites; but as there was no charge of fraud practiced upon the county court in selecting the new site and ordering the change, that question could not have been material, for the county court had exclusive jurisdiction over the subject, which could not be controlled by the chancery court.

"As a general rule, in all cases involving the location, repair, removal and furnishing of county buildings, such as courthouses, jails, and public offices, the court or county commissioners exercise a discretion which can not be controlled by any judicial tribunal, in the absence of fraud, corruption or unfair dealing." 7 Am. & Eng. Enc. of Law (2 ed.) p. 996.

The remedy of appellants to correct an abuse by the county court of its power in selecting the wrong site was by appeal after making themselves parties to the proceedings in the county court. *Bowman* v. *Frith*, 73 Ark. 527.

Our conclusion upon the whole case is that the decree of the chancellor was erroneous, and that it should be reversed with directions to dismiss the complaint for want of equity.

It is so ordered.