# THE STATE ex rel. WILLIAM KEMPER v. ALEX CARTER et al., Judges, and JOHN B. GRAHAM, Clerk, of the County Court of Audrain County.

### In Banc, April 2, 1914.

1. **CONSTITUTIONAL PROVISION: Construction: Decisions of Courts from Which Borrowed.** In the construction of a constitutional provision which was borrowed from another State the construction placed thereon by its highest court prior to its adoption in this State is greatly persuasive of its meaning.

2. ————: **Referendum Petition: Suspends Legislative Act Ab Initio.** Whenever an act enacted by the General Assembly is of the character to which the referendum provision of the constitutional amendment adopted in 1908 may properly be made to apply, the act is suspended by the filing with the Secretary of State of a legal, sufficient and timely petition for the submission of the act to a vote of the people for their approval or rejection, and thereafter such an act does not take effect until after it has been approved at an election by a majority of the votes cast thereon.

3. ————: ————: ————: **Self-Enforcing.** The provisions of the constitutional amendment of 1908 providing that "referendum petitions shall be filed with the Secretary of State not more than ninety days after the final adjournment of the session of the legislative assembly which passed the bill on which the referendum is demanded" and "any measure referred to the people shall take effect and become the law when it is approved by a majority of the votes cast thereon, and not otherwise," are self-enforcing; and the timely filing of sufficient petitions suspends the legislative act, irrespective of any statutes prescribing further steps to be taken by the Secretary of State and Attorney-General after such petitions are filed.

4. ————: ————: **When Considered Filed.** If the petitions for the referendum were filed with the Secretary of State within the time prescribed by the Constitution and he examined them "in a general and supervisory way" in order to determine whether they were legally sufficient prima-facie as to the number of signatures and formal as to verification and other requirements, and determined these facts in the affirmative, the legislative act upon which the referendum was demanded was suspended, even though he did not then nor for some time later definitely count the number of signers and no title for the referendum ballot was furnished by the Attorney-General until some time thereafter.

State ex rel. v. Carter.

5. ———: ———: ———: **Directory Statute.** The statute, requiring the Secretary of State, upon the filing of petitions with him demanding a referendum to the people upon a legislative act, to "forthwith transmit to the Attorney-General a copy" of the measure to be submitted, and the Attorney-General "within ten days thereafter" to "provide and return to the Secretary of State a ballot title for said measure," is mandatory to the extent that it requires those officers to comply with those requirements in ample time to permit a vote on the measure; but as to the rights of the people to vote on the measure those provisions are directory only, and no vote thereon will be defeated because they are not immediately obeyed, and they will be considered complied with if done in ample time for the submission of the measure to a vote, and neither is the legislative act any the less suspended because they are not complied with "forthwith" upon the filing of the petitions, if those petitions were filed in time and are in fact sufficient as to number of legal signers, affidavits, etc.

6. **LOCAL OPTION ELECTION: Validity Tested by Mandamus.** Since by a late amendment to the Local Option Law an election held under that law may be contested once for all, the court will not assume or entertain jurisdiction by an original mandamus suit of an action whose sole object, in the last analysis, is to order, *vel non*, the issuance of a dramshop license to relator alone, since such mandamus does not suffice to prevent other citizens from bringing a like suit to have the election declared invalid as to them, and therefore the legal remedy should be pursued, and equity ought not to assume jurisdiction. But in this case, where the vexing question as to whether a legislative act modifying that law is suspended by sufficient referendum petitions timely filed is involved, and other counties are clamoring for a settlement of that question, jurisdiction of a mandamus proceeding is taken to determine the validity of a Local Option election.

7. ———: **Qualification of Voters: What Election Used for Basis: Number of Petitioners.** A recital in the records of the city council concerning a petition for a Local Option election that "said petition is signed by one-tenth of the qualified voters of the city of Mexico" was sufficient, and the further recital "who were qualified to vote for members of the Legislature in said city and county of Audrain at the last previous general election held therein" may be treated as surplusage, there being no question that the petition was signed by at least one-tenth of the legal voters of said city. Section 7239 does not prescribe what election the city shall use as a basis for ascertaining the number of voters who must sign a petition for a Local Option election in a city, and in such case the council should use the latest official sources of information.

## Mandamus.

WRIT DENIED.

*George Robertson* and *McBaine & Clark* for relator.

(1) Mandamus is a proper remedy to compel the issuance of a license to keep a dramshop, if the dramshop law was in force in Mexico, Missouri, when the license was refused, and the Local Option election was illegal and void. State ex rel. v. Turner, 210 Mo. 77; State ex rel. v. Ross, 160 Mo. App. 682; State ex rel. v. Ross, 161 Mo. App. 671. (2) The election in Mexico, on October 27, 1913, was illegal and void and of no effect and the dramshop law was not suspended, because the city council of the city of Mexico failed to order the same according to the provisions of Sec. 7239, R. S. 1909, which relates to Local Option elections in cities of over twenty-five hundred inhabitants, and which provides that such elections shall only be ordered when the petition therefor is "signed by one-tenth of the qualified voters of any incorporated city or town in the State having a population of twenty-five hundred inhabitants or more." The city council did not make such finding, but on the contrary, found that the petition was "signed by one-tenth of the qualified voters of said city of Mexico, Missouri, who were qualified to vote for members of the Legislature in said city and county of Audrain at the last previous general election therein." Upon this finding by the city council a valid and legal election could not therein be held. State ex rel. v. Weeks, 38 Mo. App. 566; State ex rel. v. Bird, 108 Mo. App. 163; State ex rel. v. Ross, 160 Mo. App. 704. (3) The city council has not determined the result of the special election of October 27, 1913, nor has it published the result of the election as required by Sec. 7242, R. S. 1909. Un-

til the publication of the result of the election is commenced the dramshop law is not suspended, so far as the granting of licenses is concerned, but up to the time of the commencement of a legal publication one holding a dramshop license expiring after the election and before the commencement of the publication is entitled to renewal of his license for a period of six months if he has previously filed a two-thirds petition. Secs. 7239, 7242, R. S. 1909; State ex rel. v. Ross, 160 Mo. App. 702. (4) The election at Mexico, of October 27, 1913, was invalid and illegal because at that time the Local Option Law relating to elections in cities of twenty-five hundred inhabitants or more, had been repealed by the Act of March 10, 1913, known as the County Unit Local Option Law, which was in full force and effect and had not been suspended by referendum petitions. (a) The filing of referendum petitions by the people does not of itself work a suspension of the law, but on the contrary, only if sufficient, refers the law to the people for approval or rejection at the next election. Secs. 36, 57, art. 4, Constitution; Telephone Co. v. Oregon, 223 U. S. 118; Sears v. Multnomah County, 49 Ore. 45; 36 Cyc. 1071; Road District v. Huber, 212 Mo. 551; State ex rel. v. Wells, 210 Mo. 701; State ex rel. v. Bishop, 41 Mo. 17. (b) Certainly, under no view of section 57 of article 4 of the Constitution of Missouri, is the law upon which referendum petitions are filed suspended until the Secretary of State has counted the names upon the petition and determined their sufficiency. This was not done until December 11, 1913, after the Mexico election of October 27, 1913. State ex rel. v. Roach, 230 Mo. 408.

*E. S. Gantt, E. A. Shannon* and *Fauntleroy, Cullen & Hay* for respondents.

(1) The issuance of a writ of mandamus is a matter of discretion and not a matter of right and the writ should not issue until it appears that justice re-

quires it. State ex rel. v. Cottengin, 172 Mo. 129; Bank v. Clerk, 141 Mich. 404; Bibb v. Gaston, 146 Ala. 434; People v. Rock Island, 215 Ill. 488; Kenneally v. Chicago, 220 Ill. 485; Cicero v. People, 105 Ill. App. 406; People v. Chicago, 106 Ill. App. 72; McCarthy v. Boston, 188 Mass. 338; People v. State Auditors, 42 Mich. 422; Lamphere v. Grand Lodge, 47 Mich. 429; Fletcher & Sons v. Circuit Judge, 136 Mich. 511; State v. Barret, 30 Mont. 203; Moores v. State, 71 Neb. 522. The writ of mandamus should not be issued unless the petitioner shows a clear right thereto. State ex rel. v. Fletcher, 39 Mo. 388; State ex rel. v. Lesueur, 136 Mo. 452; Seibert v. Swayne, 97 Ill. App. 85; People v. Heit, 116 Ill. App. 391; State v. Bever, 143 Ind. 488; State ex rel. v. Lumber Co., 115 La. 893; People v. Judge, 19 Mich. 296; People v. Woodbury, 85 N. Y. Supp. 174, 88 App. Div. 443; Huddleston v. Board of Comrs., 8 Okla. 614; Commonwealth v. James, 214 Pa. 319; Hutton v. Holt, 52 W. Va. 672. Mandamus will not lie against a public officer to control a discretionary power. State ex rel. v. Oliver, 116 Mo. 188; State ex rel. v. Higgins, 84 Mo. App. 531; State ex rel. v. Horner, 10 Mo. App. 307; State ex rel. v. County Court, 31 Mo. 545; State ex rel. v. Francis, 96 Mo. 44; State ex rel. v. Board of Health, 103 Mo. 22; State ex rel. v. Jones, 155 Mo. 570. To entitle one to a writ of mandamus against a public officer it must appear that a proper demand has been made upon him, and that he has refused to perform the act. State ex rel. v. Lesueur, 136 Mo. 452; State ex rel. v. Associated Press, 159 Mo. 410. Mandamus only lies to compel the performance of a duty clearly enjoined by law. State ex rel. v. Hudson, 13 Mo. App. 61; State ex rel. v. Williams, 99 Mo. 291. Mandamus is a remedial process and is not available to compel the performance of an act that will work public or private mischief, or to compel compliance with the strict letter of the law in disregard of its spirit. People v. Assessors, 137

N. Y. 201; Buckley v. Eisendrath, 58 Ill. App. 364. Where a subordinate body is vested with power to determine a question of fact, the duty is judicial; and though it would be compelled by mandamus to investigate the fact, it cannot be directed to be decided in a particular way; however the way the decision ought to be, may appear. State ex rel. v. Thornhill, 160 S. W. 558; State ex rel. v. Stiff, 104 Mo. App. 685; Church v. Weeks, 38 Mo. App. 556; State ex rel. v. County Court, 39 Mo. 521. In a proceeding by mandamus, where the direct relief sought is the issuance to relator of a dramshop license, the adjudication of the validity or invalidity of a local option election is a collateral question. It is a settled rule that mandamus cannot be made the instrument for giving a court jurisdiction of litigation on collateral matters. State ex rel. v. Wooten, 139 Mo. App. 221. A direct remedy having been provided by law for the contest of local option elections such remedy is exclusive—concurring opinion in State ex rel. v. Ross, 161 Mo. App. 673. (2) No person has an inherent, or natural right, to sell intoxicating liquors. Austin v. State, 10 Mo. 591; State v. Aiken, 42 S. C. 231; People v. Creiger, 138 Ill. 148; Harrison v. People, 222 Ill. 150; Crowley v. Christensen, 137 U. S. 86. Should a doubt arise as to the right of an applicant for a dramshop license to the issuance thereof, such doubt should be resolved in favor of the public and against the applicant. State ex rel. v. Higgins, 84 Mo. App. 535. The county court has exclusive jurisdiction to grant dramshop licenses and the finding of the court upon any issue of fact on an application for dramshop license is final. State ex rel. v. Thornhill, 160 S. W. 558. (3) The court will take judicial notice of the filing of a referendum petition in the office of the Secretary of State, and also the action of the Secretary on said petition. 16 Cyc. 904-905; Martin v. State, 51 Wis. 407; State v. Gramelspacher, 126 Ind. 398; Roach v. Fletcher, 11 Tex. Civ. App. 225.

Judicial knowledge of a statute includes the date when it went into effect, when it was suspended or repealed. 16 Cyc. 892; Jackson v. State, 142 S. W. 1153. (4) The County Unit Bill was suspended by the filing of referendum petitions. State v. Moore, 145 S. W. 199; Kadderly v. Portland, 74 Pac. 720; Sec. 57, art. 4, Constitution; Bradley v. Bridge Co., 185 Fed. 544. Any measure referred to the people is suspended in its force and effect upon the filing with the Secretary of State of a legally sufficient referendum petition. This we submit to be the clear intent of the people, as expressed in the language of the referendum provisions of the Constitution. The initiative and referendum provisions of the Constitution are self-enforcing. State v. Langworthy, 104 Pac. (Ore.) 424; Stevens v. Benson, 50 Ore. 269; State v. Moore, 145 S. W. (Ark.) 199; Norris v. Cross, 105 Pac. 1004. The Secretary of State, in determining the sufficiency of the petition, has no power to subpoena witnesses, or to take testimony. He must act upon the evidence presented to him, or within his reach without legal process to compel the production of evidence. He is therefore clearly entitled to act upon the evidence presented by the petition itself as to its form, legal regularity upon its face, suggestion or lack of suggestion of fraud or irregularity, the manner of certification to him, the affidavit of the circulators and the number of signers determined either by actual count, name by name, or by the size and bulk of the petition. State ex rel. v. Olcott, 62 Ore. 279; Woodward v. Barbour, 59 Ore. 70. A bill enacted even with an emergency clause is suspended by the filing of referendum petitions. Kedderly v. Portland, 44 Ore. 118. (5) The petition upon which the election was ordered was in fact legally sufficient and so found by the council. The petition alleges that the signers were "qualified voters" of the City of Mexico. The petition is a part of the record. State v. McCord, 207 Mo. 519. Any reasonable interpretation in favor of the right

exercise of jurisdiction of the city council ought to be adopted. Mastin v. Stotler, 107 Mo. 326., If the council found that they were qualified voters of said city, it was not necessary for them to further find that they were qualified to vote for members of the Legislature in said city and county of Audrain at the last previous election held therein, but if they did make such finding, this in nowise destroyed or affected their findings that the signers were qualified voters. In fact, if they were qualified to vote for members of the Legislature they were ''qualified voters'' within the meaning of the law. State v. Foreman, 121 Mo. App. 502; State v. Hitchcock, 124 Mo. App. 121; State v. Searcy, 39 Mo. App. 393. Relator's contention that the election should have been ordered by resolution or ordinance is unfounded. An order is sufficient. State v. Armstrong, 140 Mo. App. 721; O'Laughlin v. Kirkwood, 107 Mo. App. 302; State ex rel. v. Allen, 178 Mo. 555.

FARIS, J.—Relator, a citizen of the city of Mexico, in Audrain county, Missouri, brings this original proceeding by mandamus against respondents, who are respectively the three judges and the clerk of the county court of said county, to compel the renewal of his dramshop license as such renewal is provided for by section 7206, Revised Statutes 1909.

After the filing herein of relator's petition and of the return of the respondents to our preliminary rule, W. C. Hughes, Esq., of the Montgomery County bar, was appointed commissioner to take testimony and make up for us findings of facts. All of this has been done and the case is before us upon the petition, the return, relator's reply thereto, the evidence taken and the findings of fact made by the commissioner. All of this presents in a very clear way the facts which are plain, easily found and not controverted in any material aspect. These facts so far as they are pertinent

to the points mooted upon this record are about as follows:

The city of Mexico, of which relator is a resident and a citizen, has a population based upon the last census of 5939. It is organized as a city of the third class and geographically is situated in Salt River township in Audrain county, Missouri. There were cast at the last general election for members of the Legislature and other officers held in 1912 in the city of Mexico, 308 votes, and at the city election in 1911 there were cast therein 342 votes. There were cast in the said November election of 1912 in Salt River township, which township not only includes the city of Mexico, but a large portion of the surrounding country, 1988 votes. No subsequent vote of the whole city of Mexico of a date later than November, 1912, is shown by the record.

At the regular monthly meeting of the city council of Mexico held on September 22, 1913, a petition was presented signed by C. A. Witherspoon and 369 others, all purporting to be qualified voters of said city, praying that a special election be held therein under the provisions of our statute commonly called the "Local Option Law," to determine whether or not intoxicating liquor should be sold within the corporate limits of said city. Of these 370 petitioners, at least 264 are shown by the record before us to have been legal signers. Upon the coming in of this petition the city council made an order providing for a holding of the election prayed for, which order, since it may become pertinent herein, we set out in full:

LOCAL OPTION PETITION.

C. A. Witherspoon et al.

Be It Remembered, That on the 22nd day of September, 1913, the same being the regular meeting of the city council of the city of Mexico, Missouri, among other proceedings, a petition was filed and received by the city council of the city of Mexico, Missouri, signed by C. A. Witherspoon et al., pray-

ing for a special election to be held in said city of Mexico, a
city containing twenty-five hundred inhabitants or more, to
determine whether or not spirituous and intoxicating liquors,
including wine and beer, should be sold within the corporate
limits of said city of Mexico, and on the 22nd day of September,
1913, the same being a regular meeting of the city council of
Mexico, Missouri, the following, among other proceedings, were
had and entered of record, to-wit:

Now comes C. A. Witherspoon et al., and present their
petition to the city council of the city of Mexico, Missouri,
praying for a special election to be held in the city of Mexico,
Missouri, as provided by article 3 of chapter 63, of the Revised
Statutes of Missouri, 1909, commonly known as the "Local
Option Law," to determine whether or not spirituous and in-
toxicating liquors, including wine and beer, shall be sold within
the corporate limits of said city of Mexico, Missouri, and the
city council of the city of Mexico, Missouri, having seen and
heard said petition and having examined the names of per-
sons signed to said petition, doth find that said petition is
signed by one-tenth of the qualified voters of said city of
Mexico, Missouri, who were qualified to vote for members of
the Legislature in said city and county of Audrain at the last
previous general election held therein, and that said city of
Mexico, Missouri, now has a population of twenty-five hundred
or more.

Thereupon Councilman Sanford moved that the petition
of C. A. Witherspoon et al. for said special election be granted
and that said special election be ordered held within the cor-
porate limits of said city of Mexico on Monday, the twenty-
seventh day of October, 1913; said motion was seconded by
Councilman Wood, and said motion was placed before the
council of the city of Mexico by Mayor Potts and on a call for
a vote on said motion from the members of said city council
present, the following voted in favor of said motion:  J. A.
Lewis, S. J. Sanford, Leo Hanley, J. J. Wood, C. A. Rothwell,
J. H. Ballew, Ernest Johnson. Councilman Atkinson was
absent. It was, therefore, announced by Mayor Potts that said
motion had carried.

It is, therefore, ordered by the city council of the city of
Mexico, Missouri, that a special election be held in said city
of Mexico, Missouri, at the usual voting precincts therein to-wit:
First Ward, circuit clerk's office in the Court House; Second
Ward, at James Wiggington's blacksmith shop at 309 West
Love street; Third Ward, council rooms in the City Hall;
Fourth Ward, C. W. Peterson's coal office, East Liberty street,
on the 27th day of October, 1913, to determine whether or not
spirituous and intoxicating liquors, including wine and beer,
shall be sold within the corporate limits of said city of Mexico,

Missouri, and the tickets to be voted in said election shall have written or printed on them the words:

"Against the sale of intoxicating liquors."

"For the sale of intoxicating liquors."

"(Erase the clause you do not want.)"

It is further ordered that said election shall be conducted, the returns thereof made and the result thereof ascertained and determined in accordance, in all respects, with the laws and ordinances governing municipal elections in said city of Mexico, and the results thereof shall be entered upon the journals or records of the city council of the city of Mexico, Missouri, and the expenses of said election shall be paid out of the treasury of said city of Mexico, Missouri, in the same manner as the expenses of other municipal elections.

It is further ordered that a notice of said election shall be published in the Mexico Weekly Ledger, a newspaper published in the city of Mexico, county of Audrain and State of Missouri, and that said notice shall be published in said paper for four consecutive weeks and the last insertion in said newspaper shall be within ten days before the day of said election.

Thereafter, pursuant to the above proceedings by the city council, an election was held in said city on the 27th day of October, 1913, the result of which, as well as the orders made by the city council in casting up and in determining such result and in ordering the same to be published and promulgated, are more at length and fully shown in the below excerpt from the record of the city council, which is as follows:

Council proceeded to ascertain and determine the votes given for and against the sale of intoxicating liquors at the election held in Mexico, in the State of Missouri, on the 27th day of October, 1913.

Therefore, be it remembered that on the 27th day of October, 1913, the undersigned members of the city council of the city of Mexico, Missouri, under and by virtue of the provisions of section 7239 of the Revised Statutes of Missouri, 1909, and the provisions of the ordinances of the city of Mexico, in the State of Missouri, ascertained and determined the votes cast in the special election held in said city on the 27th day of October, 1913, to determine whether spirituous and intoxicating liquors, including wine and beer, should be sold within the corporate limits of the city of Mexico in the State of Missouri, and found that there were fifteen hundred and thirty-three (1533) votes cast in said election; that seven hundred and

State ex rel. v. Carter.

ninety-nine (799) votes were cast in said election against the sale of intoxicating liquors and seven hundred and thirty-four (734) were cast in said election for the sale of intoxicating liquors, and that the majority of votes cast in said election against the sale of intoxicating liquors was sixty-five (65.)

J. A. LEWIS,

E. L. JOHNSON,

S. J. SANFORD,

P. L. HANLEY, '

C. A. ROTHWELL,

J. J. WOOD.

Members of the City Council of Mexico, Missouri.

It is therefore ordered by the council that the result of the local option election held in the city of Mexico, Missouri, on the 27th day of October, 1913, as ascertained and determined by the city council of the city of Mexico, Missouri, be entered upon the record of the city council of the city of Mexico, Missouri, which said record is in words and figures as follows, to-wit:

"In the matter of the special election held in the city of Mexico, in the State of Missouri, on the 27th day of October, 1913, to determine whether or not spirituous and intoxicating liquors, including wine and beer, should be sold within the corporate limits of said city of Mexico, it appearing to the city council of the city of Mexico, Missouri, from the returns of said election, as furnished by the judges of said election and as furnished by members of the city council of the. city of Mexico, Missouri, to the city .council of the city of Mexico, Missouri, that the whole number of votes cast in said election was fifteen hundred and thirty-three (1533); that the whole number of votes cast in said election for the sale of intoxicating liquors was seven hundred and thirty-four (734); and that the whole number of votes cast in said election against the sale of intoxicating liquors was seven hundred and ninety-nine (799); and that the majority of the votes cast in said election against the sale of intoxicating liquors was sixty-five (65),

"It is therefore ordered by the mayor and city council of the city of Mexico, Missouri, that the city clerk of the city of Mexico, Missouri, shall cause the result of said election ascertained and determined, as aforesaid, to be published once a week for four consecutive weeks in the Mexico Ledger, which is the same newspaper in which the notice of said election was published."

There had been issued to relator by the proper authorities, both of Audrain county and of the city of Mexico, on the 9th of May, 1913, a dramshop license

for the period of six months, which license, it is averred and admitted in the petition herein, expired on the 8th day of November, 1913. On said last mentioned date the county court of Audrain county was not in session, and relator, pursuant to section 7206, supra, demanded of the respondent John B. Graham, as clerk of the county court of said county, a renewal of his dramshop license for the further period of six months. This demand being denied this original proceedings in mandamus was instituted here. It is conceded that relator had on his part complied with all conditions precedent, and that but for the election aforesaid was entitled to this renewal.

The several contentions made by relator may, in our view, be fairly reduced to three, and for two of these reasons relator contends that the Local Option election was ordered and held by the city council of Mexico without authority of law and therefore that the result thereof is void and of no effect.

First, because section 7239, Revised Statutes 1909, under which elections separate from the county are authorized to be held by cities having 2500 population or more, was repealed by the 47th General Assembly by the provisions of an act passed thereby which is generally known as the "County Unit Bill" (Laws 1913, p. 388, et seq.); that the provisions of the County Unit Bill are not suspended by the filing of referendum petitions, and that if ordinarily the filing of such petitions would have the effect of suspending the operation of an act of the Legislature such suspension did not occur as to the County Unit Law (a) because of the alleged failure of the Secretary of State to forthwith ascertain and determine the sufficiency of the referendum petitions filed with him, and (b) because of the failure of the Attorney-General to provide and return to the Secretary of State within ten days a ballot title for the referendum vote upon the measure, all prior

to the alleged Local Option election so held on October 27, 1913, in the city of Mexico.

Second, because said alleged Local Option election was neither legally ordered nor held, nor the result thereof legally declared: (a) because the petition therefor was not signed by one-tenth of the qualified voters of the city of Mexico; (b) because the record of the city council does not so find and show that such proper and legal signatures of one-tenth of the qualified voters of said city were attached to said petition; (c) that the alleged Local Option election was not ordered by the city council by resolution or ordinance, and that the result thereof was not declared by said city council by either ordinance or resolution.

Third, that even if such election was ordered and held in compliance in all respects with the law, relator was entitled upon his application filed with the county court on November 4, 1913, to a renewal of his license for the reasons that there had not then been published or begun to be published the result of such alleged election in any newspaper.

It may contribute somewhat to the clarity of the views hereinafter expressed if certain facts bearing upon the above contentions of relator should be more at length referred to.

Though the license of relator did not expire until November 8, 1913, he filed on October 21, 1913, his application for renewal of his license with the county clerk. This application, together with all necessary bonds and affidavits, was laid before the county court on November 4, 1913, and indorsed by the court "refused." Later and on the 9th of November, and on the day following the expiration of the first six months' period of the license, application was again made to the clerk for renewal, in vacation of the county court, and renewal thereof was refused. On the 6th day of November, 1913, and two days prior to the expiration

of relator's license, publication of notice of the result of the election was commenced in the Mexico Ledger, a weekly newspaper printed and published in said city, county and State, and which publication was had weekly till and including the issue of December 4, 1913, and in all a total of five insertions in said paper. This publication seems to be as to the contents thereof in proper form, and since no set attack is made upon it it is not necessary to cumber this opinion with it.

The testimony of the Secretary of State was taken in this case upon the contention urged, that he had not "ascertained and determined the sufficiency of the referendum petitions before the filing thereof and his failure to transmit to the Attorney-General a copy of the referendum petition with the signatures thereto and the failure of the Attorney-General to provide and return to the Secretary of State a ballot title for the measure prior to the election above referred to." Upon this contention the record before us shows that the referendum petitions relating to the so-called County Unit Bill were lodged with and filed by the Secretary of State on June 18, 1913; that a few parts thereof were brought in prior to that time, but that the formal filing was made on that day and that on said day the Secretary of State in connection with the Governor and the person offering the petitions for filing examined the same "in a general and supervisory way" in order to determine whether such petitions were legally sufficient prima-facie as to the number of signatures and formal as to verification and other requirements of law, and upon that date determined these facts in the affirmative; that the Secretary of State thereupon in the presence of the Governor and of the person offering the petitions for filing "detached the text of the petition that is on the top of each pile from each congressional district, and stated to those present that this separation would be regarded as constructively complying with the provisions of the law for separating

the names from the text and in all other details." It is further shown that proper affidavits as to the genuineness of the signatures were appended to the several parts of the petitions and that so far as numbers are concerned, and so far as the number of congressional districts from which the petitions and affidavits come, they are in all things sufficient. On this point we need not enlarge or go into detail, since upon it no contention is made. It is urged, however, that the actual number of names contained upon these petitions should have been definitely and exactly ascertained by the Secretary of State upon the date on which they were filed, and that they then should have been counted. The record shows that they were not actually counted until December 11, 1913, and that no title for the referendum ballot upon the question of whether the County Unit Bill should be approved by the people was furnished by the Attorney-General until December 28, 1913.

The above statement of facts is deemed sufficient in order to make clear the discussion in the subjoined opinion of the contentions made by the relator.

## OPINION.

I. The first contention urged by the relator is that the act commonly called the "County Unit Bill" (Laws of Mo. 1913, p. 388) went into effect ninety days

Legislative Act: Suspension By Referendum. after the adjournment of the 27th General Assembly, notwithstanding the reference of that act to a vote of the people for their approval or rejection pursuant to the referendum provision of our Constitution. On the other hand respondents contend that the filing of a proper, timely and sufficient referendum petition for such submission of this act to a vote of the people, had the effect of suspending the taking effect of the act till such vote shall be had.

Section 57 of article 4 of our Constitution, commonly called the "Initiative and Referendum," was adopted at the general election held in November, 1908. This provision is an exact copy of the like provision of the Constitution of the State of Oregon, except a prohibition in our Constitution against the application of the referendum to certain appropriations, and a slight diminution of the number of petitioners required to put the referendum provision into action. Oregon adopted the referendum in 1902; six years later we copied the section below set out from the amendment to the Oregon constitution of 1902, and adopted it practically verbatim with the changes and additions only, which we shall note therein in italics. This amendment to our Constitution reads thus:

"The legislative authority of the State shall be vested in a legislative assembly, consisting of a senate and house of representatives, but the people reserve to themselves power to propose laws and amendments to the Constitution, and to enact or reject the same at the polls, independent of the legislative assembly, and also reserve power at their own option to approve or reject at the polls any act of the legislative assembly. The first power reserved by the people is the initiative, and not more than eight per cent of the legal voters *in each of at least two-thirds of the congressional districts in the State* shall be required to propose any measure by such petition, and every such petition shall include the full text of the measure so proposed. Initiative petitions shall be filed with the Secretary of State not less than four months before the election at which they are to be voted upon. The second power is the referendum, and it may be ordered (except as to laws necessary for the immediate preservation of the public peace, health or safety *and laws making appropriations for the current expenses of the state government, for the maintenance of the state institutions and for the support of public schools*) either by the petitions

signed by five per cent of the legal voters *in each of at least two-thirds of the congressional districts in the State*, or by the Legislative Assembly, as other bills are enacted. Referendum petitions shall be filed with the Secretary of State not more than ninety days after the final adjournment of the session of the legislative assembly which passed the bill on which the referendum is demanded. The veto power of the governor shall not extend to measures referred to the people. All elections on measures referred to the people of the State shall be had at the biennial regular general elections, except when the legislative assembly shall order a special election. Any measure referred to the people shall take effect and become the law when it is approved by a majority of the votes cast thereon, and not otherwise. The style of all bills shall be: 'Be it enacted by the people of the State of *Missouri.*' This section shall not be construed to deprive any member of the legislative assembly of the right to introduce any measure. The whole number of votes cast for Justice of the Supreme Court at the regular election last preceding the filing of any petition for the initiative, or for the referendum, shall be the basis on which the number of legal voters necessary to sign such petition shall be counted. Petitions and orders for the initiative and for the referendum shall be filed with the Secretary of State, and in submitting the same to the people he, and all other officers, shall be guided by the general laws and the act submitting this amendment, until legislation shall be especially provided therefor.''

The State of Arkansas likewise has adopted as a part of the organic law of that State the provisions of the Initiative and Referendum, appropriating bodily for the purpose the similar provision of the Oregon constitution. [State ex rel. v. Moore, 145 S. W. l. c. 201.]

In the construction of statutes, and by parity of reasoning it would seem of constitutional provisions as

well, it is almost fundamental that when the language
of a law vexing us has come to us by adoption from
another state, we are greatly persuaded by the con-
struction put upon the law by the state of its origin.
[State ex rel. v. Miles, 210 Mo. 127; Knight v. Rowl-
ings, 205 Mo. 412.] We have seen that we got our
referendum provision bodily from Oregon. Before
we adopted it by voting it into our Constitution, and
to be exact on January 29, 1907, the Supreme Court of
Oregon construed it upon the point of whether the legal
invocation of the referendum upon an act of the Legis-
lature had the effect of suspending the taking effect
of such act until a vote thereon should be had and such
act should be approved by the people through such
vote. [Sears v. Multnomah County, 49 Ore. 42.] Upon
this point Mr. Justice EAKIN, who delivered the unani-
mous opinion of the court, among other things, said:

"That an act may take effect under a general
emergency clause, and yet be subject to the referen-
dum, is clearly contrary to the intent of the amend-
ment, and would produce disastrous results. The
clause in the amendment which reads, 'Any measure
referred to the people shall take effect and become the
law when it is approved by a majority of the votes
cast thereon, and not otherwise,' clearly means that a
law upon which the referendum is invoked cannot take
effect prior to its approval by the vote; and con-
sequently no act that is subject to the referendum can
be made to go into operation for ninety days after the
adjournment of the session or its approval by vote."

When we consider the primary object of the
adoption of the referendum and have regard to the
evils which its friends had in mind to correct by it, any
view other than that it suspends the taking effect of
the act against which it is invoked till a vote be had is
illogical and well-nigh unthinkable. The fact that the
people of the State reserved to themselves the right
to say whether an act of the Legislature should ever

become an effective law, is accentuated as a major premise in the very forefront of section 57, and in what we may with a bit of aptness call the "ordaining clause." For observe that this section says: "But the people reserve to themselves power . . . at their own option to approve or reject at the polls any act of the legislative assembly." Further along in the section our organic referendum law pertinent to this question also says: *"Any measure referred to the people shall take effect and become the law when it is approved by a majority of the votes cast thereon and not otherwise."* (Italics are ours.) Can there be two minds that this language has specific reference to the time of the taking effect of an act of the Legislature touching which the referendum provisions of the law and the Constitution have been invoked? Can there be any, the remotest doubt that likewise this clause means what it says?

Aside from the view which we ourselves may take of the meaning of the above unambiguous language of our Constitution, there is ample authority from other jurisdictions upon the question of the meaning and applicability of this clause. In the case of Bradley v. Union Bridge & Construction Co., 185 Fed. 545, it was said:

"From a reading of the language quoted, it seems clear that the clause providing that a measure 'shall take effect and become the law when it is approved by the majority of the votes cast thereon, and not otherwise,' has reference only to measures upon which the referendum has been invoked by petition, or which have been referred to the people by the Legislature, and not to measures proposed under the initiative. It is a part of the amendment dealing with the referendum powers. It says 'any measure referred to the people,' and a measure is so referred only by petition or by the Legislature. The initiative power is defined in the Constitution as the right to propose a law or amendment to the

Constitution, while the referendum is the right to approve or reject at the polls any act of the Legislature. An initiative measure is therefore proposed, and one on which the referendum has been invoked or ordered is referred. So, when the Constitution uses the words 'any measure referred,' it necessarily means a referendum, and not an initiative measure.

"There is a clear distinction made between measures proposed for adoption by the people, and measures referred to them for their rejection or approval. In the latter it is declared that the measure shall not take effect and become the law until approved by a majority vote. This was undoubtedly deemed necessary in order to prevent a law passed by the Legislature from going into effect as provided in section 28, article 4, of the Constitution, notwithstanding a referendum has been invoked thereon. No such provision as to when a law proposed by the initiative should go into effect was necessary, however, for it would take effect from and after the date of its approval, unless otherwise declared therein."

Not alone does this view accord with the clear meaning of the language used, but it is in consonance with business orderliness and plain good common sense, and in accordance likewise with the views held by every court in which the point has been made. This identical question has been up for ruling in Arkansas, where the Oregon referendum provision, as we have already said, has been carried almost bodily into the Constitution of that State. Discussing it in the case of State ex rel. v. Moore, 145 S. W. l. c. 201, a case which among others involved the identical question here vexing us, it was said:

"Under this initiative and referendum amendment, only 'laws necessary for the immediate preservation of the public peace, health or safety' are excepted from .its provisions, and no power is reserved by the people to pass directly upon such laws. All other laws are

subject to its operation; and, ninety days being given by its terms from the final adjournment of the session of the Legislature which passed them in which to demand or order the referendum thereon, they cannot take effect or go into operation till the expiration of ninety days after such adjournment, nor thereafter until approved by the people, if the referendum is ordered or invoked.''

Aside from these most persuasive cases from other jurisdictions, by our own construction of section 57 of article 4 of our Constitution, as amended in 1908, we feel constrained to hold, without doubt or hesitation, that all acts of the Legislature touching which the referendum may be properly invoked, are suspended by the filing of a legal, sufficient and timely petition for the submission of such acts to a vote of the people for their approval or rejection, and that all such acts take effect when and only after a vote of the people has approved them at an election in which a majority of the votes are cast in favor of such act. If we were in doubt about this, if the language of our referendum provision, or the authorities from other states, or the common sense and even decency of the situation left a peg of logic standing on which to hang a doubt or a quibble, the fact that such an act thus and then only becomes effective after a vote and even after the proclamation of the result of the election by the Governor, such doubt is shattered by our statute on this very point, which among other things, says:

''It shall be the duty of the Secretary of State in the presence of the Governor, to proceed within thirty days after the election, and sooner if the returns be all received, to canvass the votes given for each measure; and the Governor shall forthwith issue his proclamation, giving the whole number of votes cast in the State for and against each measure and question, and declaring such measures as are approved by majority of those voting thereon to be in full force and effect as

the law of the State of Missouri from the date of said proclamation.'' [Sec. 6754, R. S. 1909.]

II.   Germane to the above contention, the relator urges, however, that even if the taking effect of the County Unit Bill ordinarily would be suspended by the filing of a referendum petition, such suspension did not ensue under the facts in this record, **Petition for Referendum: Filing and Counting Signers.** (a) because no careful, certain and definite counting of the names on the petition filed was made by the Secretary of State till December 11, 1913, and (b) because no title for the ballot submitting the question was furnished to the Secretary of State by the Attorney-General till December 28, 1913.   These two contentions may well be considered together.

The record conclusively shows that prima facie, as shown by the count made of the names upon the referendum petition, there were sufficient names thereon. Indeed, relator does not contend that there were not sufficient petitioners, or that the names contained thereon were not those of legally qualified signers; he simply urges that by an alleged failure of the Secretary of State and of the Attorney-General to act forthwith and promptly, the will of all of the signers should be defeated.   It is persuasive, but not necessarily conclusive, that in analogous cases such destructive results do not generally follow even conceded dereliction of duty in the performance of ministerial acts.

We are not saying that there has been such dereliction here; on the contrary we are profoundly impressed that no such dereliction has occurred, but in the light of the law as we find it already written for us on this point, it may be that we will not need to reach or discuss the matter of dereliction, except academically.   It is fairly clear that if the provisions of our referendum section of the Constitution are self-enforcing, then the mere lodging of a timely, legal and sufficient referendum petition with the Secretary of State is all that the

petitioners were required to do, and that the law affected or sought so to be, is halted, regardless of any affirmative act on the part of the Secretary of State or the Attorney-General. Concededly, however, the condition shown here in this case by the record is not such as the above bald situation presents. Some six days before the expiration of the time-limits within which referendum petitions could be filed, an admittedly sufficient petition containing a sufficient number of names of legal and qualified voters as signers, whose signatures were legally and properly verified and authenticated, was presented to the Secretary of State. (We so state for the uses, purposes and law of this instant case only, since such is the legal effect of the facts and pleadings herein.) The Secretary of State, in the presence of the Governor and of the person offering the petition for filing, having "examined the same in a general and supervisory way," filed it. The actual number of names, either by congressional districts, or from the entire State, was not then definitely ascertained by actually counting them, nor was this done till December 11, 1913, at which time, an actual count having been made, the number of signers and their legally qualified character, and the number of congressional districts represented were found to be in full compliance with the law.

Aside from the views of any other court, would it not be to follow the flimsiest shadow and not the substance if we were to say that the mere postponement of the determination of the definite and exact number of signers on a referendum petition till a less pressing and more convenient season, would operate to defeat the will of those signers and prevent a vote upon a matter which might be of grave moment to the people? That the instant facts do not rise to the stature of so grave and momentous a matter is beside the question. The rule we announce must needs be general.

If upon a definite and careful count it had been ascertained that as to the whole State no sufficient number of legal petitioners had signed the referendum petition, or that no sufficient number of congressional districts were represented among the signers, or that as to one or more of such districts there was an insufficient number of signers, some substance would have existed then upon which to bottom the contention urged.

So much of our statutes which prescribe the duties of the Secretary of State upon the coming in of a referendum petition and profert thereof for filing, is *in pari materia* with and in fact in almost the precise words of the similar provision of the Oregon statute, from which state we copied it, almost, if not quite, *verbatim.* Before we adopted the referendum as a part of our organic law, and likewise of course before we passed any statute in aid of it, the State of Oregon, through its Supreme Court, had held that the referendum provision of the Constitution of the State of Oregon was self-executing. [Stevens v. Benson, 50 Ore. 269; Palmer v. Benson, 50 Ore. 277 (1907).] Likewise on a similar provision of the Constitution and under similar statutes for the carrying of the same into effect, it was held in Oklahoma that when the Secretary of State receives a referendum petition into his office and retains the same in his custody such petition will be regarded as filed, so far as the public and the public's interest are concerned, regardless of whether the Secretary of State indorses such petition as filed, or complies with the law as to detaching the printed copy of the measure from the petition in the presence of the Governor and the person offering the petition for filing or not. [Norris v. Cross, 25 Okla. 287.] It was so ruled in Oklahoma, notwithstanding there are some slight differences in the statutes of Oklahoma as compared with ours, which differences have the effect of imposing upon the Secretary of State of Okla-

homa duties which call for the exercise of a modicum
of discretion. For example, in the latter State, touching
a referendum petition duties are enjoined upon the
Secretary which involve, it is said, "the power to re-
ceive protests against the sufficiency of the petitions,
and to hear evidence and argument in support thereof,
and to determine the sufficiency of the petitions in-
volve the power to find facts and require the exercise
of judicial or quasi-judicial powers." [Norris v. Cross,
25 Okla. 1. c. 312.] We have no such provision in our
statute. The duties of the Secretary of State as to
filing a referendum petition and dealing therewith are
with us purely ministerial. [Sec. 6748-6754, R. S.
1909.]

If these cases and holdings do not settle this point
upon well-known principles of law and beyond cavil
and against the contentions of relator then a cursory
reference to the provisions of our statutes indubitably
does settle it.

It will be seen that the sole question to be de-
termined by our Secretary of State before he files a
verified referendum petition offered to him for filing is
to ascertain whether such petition has been signed by
five per cent of the voters in each of two-thirds of the
congressional districts of the State (section 6748,
supra) as shown by the vote cast in the last preceding
election for the office of judge of the Supreme Court.
[Section 57, Article 4, Constitution of Missouri.] This
duty to so far examine and determine is enjoined upon
him by fairly clear inference, but manifestly it involves
more of arithmetic than it does of discretion, either
judicial or other sort. Likewise it is manifest that
ordinarily he will be able to determine these two facts
from an inspection but little more than casual and
which may fall far short of requiring an immediate and
certain count of the whole number of signers upon the
petition presented. This was clearly the case here;

for prima facie, many more qualified signers than are required have signed the petition here.

Verity is imported to the Secretary of State that the signatures contained on the petition are the bona-fide, and not forged or fraudulent, signatures of legal voters of the State and county of which they are stated to be, by the verifications of the circulators of the petition, or sections thereof required, in substance as set out in section 6749 of our statute. While as we shall later show, this verity so imported by the verification of the circulators is prima facie only, it yet imports verity so far as that the proper number of congressional districts being represented and five per cent of the voters aforesaid appearing thereon the Secretary of State must file the same. On this point and upon the procedure enjoined at this juncture, our statute provides:

"When any such inititative or referendum petition shall be offered for filing, the Secretary of State, in the presence of the Governor and the person offering the same for filing, shall detach the sheet containing the signatures and affidavits, and cause them all to be attached to one or more printed copies of the measure so proposed by initiative or referendum petition; the detached copies of such measure shall be delivered to the person offering the same for filing." [R. S. 1909. sec. 6748.]

From this it is reasonably plain that our statute means what it says, and that *"when any such referendum petition"* (i. e. a referendum petition signed by five per cent of the voters in at least two-thirds of the congressional districts, and who purport from the verifications aforesaid [section 6749] to be legal voters of the State and of such congressional districts) *"shall be offered for filing,"* the Secretary of State shall file the same; he has no discretion in the matter. If he refuse to file such petition he may be compelled by mandamus to do so. [Section 6750.] In such man-

damus suit the legality of the signers in all respects, the number of the signers, their residences, the genuineness of their signatures and other conditions precedent to legality may be fully threshed out as cold questions of law, upon the proof made on the trial as in any other mandamus suit. If on the other hand the Secretary of State file a referendum petition which is insufficient by reason of a lack of legal signers, or for lack of enough congressional districts represented, or by reason of forgery or other fraud, he may be enjoined from further action and thereupon the whole matter of insufficiency from the lack of any requirement of statute or of Constitution, may be judicially examined, determined and adjudged.

We are not saying that the Secretary of State must file a referendum petition upon which either there is not enough congressional districts represented by the signers thereon, or not enough signers from such, or any one of such districts. But where prima facie all of these facts appear, he must file the petition as presented to him and leave to the courts the determination of questions of latent fraud, forgery and hermetic illegality; for which determination our statutes it would seem have provided full and ample machinery for every condition and contingency, and for the protection and safeguarding of both protagonists and antagonists of the act sought to be referred. Clearly the warning provided for by statute, which recites that a breach of the law as to a referendum petition constitutes a felony and the careful provisions for verification of the stated facts as to residence, names and qualifications of signers, indicate that these provisions were deemed such adequate safeguards against fraud and forgery as that compliance therewith showing prima facie sufficiency and regularity was intended to import such sufficient verity to the Secretary of State as to make it his duty to file petitions bearing such legal indicia when such were presented to him for filing.

Keeping in mind that our referendum provision, statutes being absent, is self-executing; that prima facie sufficient safeguards by verification are provided by law; that by statute legal inquiries may be speedily had in the court either to compel or restrain filing, wherein all legal questions of defaults or defects either forbidding or compelling filing, or forbidding or allowing a vote, may be fully threshed out; that other courts in other jurisdictions by strong analogy have so held; that the next regular general election at which alone a vote hereon may be had, was, when the petition herein was filed, almost seventeen months away; and that now confessedly, when the point of lack of sufficiency in these petitions is mooted and examined, it is found to be untrue and unfounded in point of fact, ought we to hold that a vote will be defeated (for that would be the ultimate logic of such a holding), simply because the Secretary of State and the Attorney-General did not instantly upon the coming in of these petitions drop all other things and respectively count the names on the petitions and provide a ballot-title for a vote to be had at an election almost a year and a half away? We think not, especially as, in addition to the other reasons we suggest, there is no specific statute requiring the Secretary of State after he shall have filed the petition to perform any other duty (so far as the controversy here goes) at any fixed time, except that he must "forthwith transmit to the Attorney-General a copy thereof (i. e. of the measure to be submitted to a vote) "and within ten days thereafter the Attorney-General shall provide and return to the Secretary of State a ballot title for said measure." Manifestly every consideration of the intent and object of the organic law and of the statute, as well as every consideration of fairness and of the rights of all persons in any way interested, is met when we hold, that as to the officials upon whom duties are enjoined by section 6751, from which we quote, the section is manda-

tory, in that prompt compliance and compliance in ample time to permit a vote may be compelled by the courts; but that as to the rights of the people so far as affects whether the matter in question shall be submitted to a vote or not, this provision is directory merely. We therefore disallow this contention to relator and rule that in the behalf here complained of the acts of the Secretary of State and of the Attorney-General when done in such ample time to permit a vote, relate back to a date as of the day of filing the petition herein and to a day ten days subsequent thereto, respectively.

III.   Relator's counsel, as doth become tried and skillful counsel learned in law, fall back from one entrenched position to another, and urge that even if the County Unit Bill is not suspended in its operation, and even if the failure of the Secretary of State to count the names on the petition and forthwith to transmit the measure to the Attorney-General and the Attorney-General to provide a ballot-title in ten days do not avail them, still the election held in Mexico was held without authority and that the same is invalid and void, for the reason, as counsel aver, that the record of the city council does not show the requisite jurisdictional facts to authorize an election to be held.

We have held in effect that we will not constitute ourselves a court to say whether dramshop petitions shall or shall not be granted; that since by a late amendment to the Local Option Law an election held under such law may be contested once for all, we will not assume or entertain jurisdiction by an original mandamus suit of an action, whose sole object, in the last analysis, is to order, *vel non,* the issuance of a dramshop license. [State ex rel. v. Ross, 245 Mo. 36; State ex rel. v. Ross, 161 Mo. App. l. c. 682; Nance v. Kear-

Local Option Election: Mandamus.

bey, 251 Mo. 374.] From this position, at once logical and to an extent dignified, and which is backed up by the great weight of authority in other jurisdictions, on the theory among others that, where the law has provided a plain and ample remedy, equity will not assume jurisdiction, or extraordinary remedies like unto equity be employed, and that statutory remedies for the contest of elections are exclusive, we do not recede. [Maxey v. Mack, 30 Ark. 472; State ex rel. v. Lewis, 51 Conn. l. c. 126; State ex rel. v. Martin, 55 Fla. 538; Ogburn v. Elmore, 123 Ga. 677; Navarre v. Gimenez, 10 Philippine, 226; People v. Deneen, 256 Ill. 536; Ex parte Strahl, 16 Iowa, 369; Harrison Co. v. Dougherty, 134 Ky. 402; Taxpayers v. O'Kelly, 49 La. Ann. 1039; Hamilton v. Carroll, 82 Md. 326; Peabody v. Boston School Committee, 115 Mass. 383; Wheeler v. Bd. of Canvassers, 94 Mich. 448; Bingham v. Jewett, 66 N. H. 382; O'Hara v. Powell, 80 N. C. 103; Dalton v. State ex rel., 43 Ohio St. 652; Kerr v. Trego, 47 Pa. St. 292; Treat v. Morris, 25 S. D. 615; Maloney v. Collier, 112 Tenn. 78; Seay v. Hunt, 55 Tex. 545; McWhorter v. Dorr, 57 W. Va. 608; McLean v. Mills, 29 Nova Scotia, 452.] We do not need to re-examine the position taken in State ex rel. v. Ross, supra, but if it was not said in that case, it ought to have been said, that the rule there announced saves time and mayhap a multitude of suits; because, if a Local Option election be contested pursuant to statute by A or B or C, or by "any qualified voter of the municipal body or of the county" (Sec. 7242, R. S. 1909), and be declared invalid as to A or B or C, or as to such contesting voter, it is by the same token invalid for all and as to all persons, and the one action suffices; whereas, if such an election may be contested now indirectly by a mandamus suit by A, it may be contested again and repeatedly in other mandamus suits by B and other hundreds of citizens as their supposed needs or interests may seemingly require.

But there is here presented by this action the other novel and vexing question touching the effect of the referendum in suspending a legislative act, containing in the points mooted difficult and likewise vexatious ramifications. From other places and other counties this itching question never before raised in this jurisdiction is clamoring for settlement. Both of the points raised are inextricably intertwined with the question of whether the order made by the Mexico city council under the facts shown by the record gave the city jurisdiction to hold the Local Option election which was held there. If this latter point were alone in the case we would not take jurisdiction of it, for the reasons stated above on the authority of State ex rel. v. Ross, supra; but both points are raised with all of the satellitious corollaries thereabout revolving. To assume jurisdiction of the case on the one point makes reasonably necessary the dealing with the other, and thus a multiplicity of suits is avoided. To deal with the one point and not with the other would be to abandon jurisdiction short of disposing of the whole case. Thus, and in no other wise do we come to examine whether the order made by the city council was or was not sufficient.

We are met again *in limine* by shadows and not matters of substance.. For without any manner of doubt the record before us shows conclusively—indeed relator does not contend to the contrary—that more than "one-tenth of the qualified voters" of the city of Mexico did petition for the holding of the election in issue here. The sole basis for the contention of invalidity of that election as made by relator is that the city council, instead of contenting itself with finding and entering upon the record of the city that the petition presented was "signed by one-tenth of the qualified voters of the said city of Mexico, Missouri," simply went further and found and declared in its record "that said

Qualified
Petitions:
What Election.

petition is signed by one-tenth of the qualified voters·
of said city of Mexico, Missouri, *who were qualified to
vote for members of the Legislature in said city and
county of Audrain at the last previous general election
held therein.*" It is contended by relator, and all that
is contended by him is, that regardless of the ultimate
truth of the case, the italicized words added to the find-
ing of the city council touching the legal qualifications
of the signers, render the election invalid and void.

A reference to section 7238 shows that the identical
qualification of the petitioners as set out in the order
of the city council herein, is required by that section
before a Local Option election will be ordered to be
held in a county by the county court. A reading of
this section likewise discloses the erroneous reason for
the addition of these words in the order and finding
here.

Pretermitting the question that this objection is
here utterly technical, that as applied to the truth of
the facts as they really existed it is as baseless as the
fabric of dreams, we come to a consideration of
whether, even as the basis of a shadowy technicality,
it is of real substance. There were 264 legal and
qualified signers; the vote of the whole of Salt River
township, which included all of the city of Mexico and a
large outlying portion of Audrain county, not within
the city limits, was in 1912, nineteen hundred and
eighty-eight. The total vote cast in the whole of the
city at the Local Option election was 1533. Since the
whole of a given thing includes all of the parts thereof,
and manifestly since the total vote of Salt River town-
ship was in 1912 only 1988, this number then includes
the whole of the vote in that year in that election of the
city of Mexico, and 264 is more than one-tenth of it.
But it is contended that though this be true the council
went back to a wrong year and a wrong vote for its
basis. The record before us shows that the total vote
of Mexico for the year 1911 was 308; the total vote

thereof at the general election in 1912 was 342, and the total vote of the entire township at the general election in 1912 was as stated above. No vote is shown for April, 1913, nor for any date subsequent to the general election held in November, 1912, to which reference is made in the order of the city council as a basis of computation. If an election was held in the city of Mexico and in all parts thereof in April, 1913, so as to furnish a tangible basis for computing the number of qualified petitioners, the record is silent about it. We cannot know judicially whether an election was held in said city in April, 1913, in which all of the voters had the right to take part or not. We do not notice, and we are not advised by the record, when Mexico became, or elected to become, a city of the third class. We notice that some members of the city council of cities of the third class, such as Mexico is, are annually elected in April, but we do not know which ones are so elected. [Sec. 9159, R. S. 1909.] We know that a vote is had in April in every alternate year following its becoming a city of the third-class to elect a mayor and perhaps other officers of such cities (Sec. 9145, R. S. 1909), but we do not notice whether such an election fell upon April, 1913, or not. While section 7238, Revised Statutes 1909, does provide for the qualifications of petitioners upon a petition for the holding of a Local Option election, and for an official place to obtain the number required, or a basis of computation of such number; section 7239, the law under which the election here was held, makes no such provision whatever. The latter section does not prescribe from what source the city council shall obtain official information as to the number of qualified voters in such city and therefore as to the requisite number of petitioners required to sign the petition for an election. In the absence of a statutory prescription as to the source of this information, it would seem either that they guess at it and thus act at their peril, in guessing a sufficient

number when the matter is tested in the courts, or that they use in their discretion the best and latest official data obtainable. We have seen, as the record shows, that this official data was either the number of votes cast in the city election in April, 1911, or the number of votes cast in the general election held in November, 1912. If they had taken the former, 31 petitioners were required; if the latter 35 only. There were 370 in fact, of whom at least 264 were confessedly legal. If the city council had based the required number upon the last complete extant vote of April, 1911, we apprehend that learned counsel would be with us urging that since there was a later official vote, to-wit, that of November, 1912, this and not the next preceding one, ought to have been made the basis of computation. The record shows that they used the very last official vote obtainable by them, and that upon such basis the number of petitioners was exactly 229 more than was required by law. In the absence of a statute in this behalf all that can be required of the city council is that in determining the number of voters as a basis of computation of the requisite number of petitioners they should use the latest official sources of information, being responsible only to the courts for the mistake of acting upon a petition containing an insufficient number of signatures. We think therefore that since the petition was in all respects sufficient as to the number and qualifications of the signers, that part of the order referring to the qualifications of the signers, as ''qualified to vote for members of the Legislature in said city and county of Audrain, at the last previous general election held therein,'' may be treated as surplusage, and that this point should be disallowed to relator.

IV. Other points are made, but the facts as we find them and state them, when applied to the law, show that there is no basis for the contention made by

relator; since section 7242 provides that no license to keep a dramshop shall be granted after the publication of the result of a local option election shall have commenced and pending the four insertions provided for therein.   Germane to this point, other minor questions are urged, which we have examined and which we think are made sufficiently clear by the Local Option statute itself, and which we will not burden this opinion by discussing, since we find no merit in them.

It results from what has been said that the alternative writ of mandamus heretofore issued herein should be quashed and the peremptory writ prayed for denied.   It is so ordered.

All concur.